UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AUTUMN GLEN HOMEOWNERS ASSOCIATION, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | 1:13-cv-01589-SEB-DKL |
| vs. | ) ) | |
| TRAVELERS INSURANCE COMPANY TRAVELERS INSURANCE COMPANY IS AN IMPROPERLY NAMED DEFENDANT. THE PROPER PARTY DEFENDANT IS THE TRAVELERS INDEMNITY COMPANY OF AMERICA., | ) ) ) ) ) ) ) ) | |
| Defendant. | ) ) | |

**ORDER ON TRAVELERS'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AND RELATED MOTIONS [DKT. NOS. 27, 38, 40]**

This matter comes before us on Defendant Travelers Indemnity Company of America Motion for Partial Summary Judgment [Dkt. No. 27], which has been fully briefed. Travelers filed two additional motions related to its Motion for Partial Summary Judgment – a Motion for Leave to Supplement Record in Support of Travelers's Motion for Partial Summary Judgment [Dkt. No. 38] and a Motion to Strike Affidavit of Mathew Latham and Plaintiff's Brief in Opposition to Defendant's Motion for Partial Summary Judgment [Dkt. No. 40]. Having carefully considered the parties' submissions, we GRANT all of Travelers's Motions.

**Background**

On August 23, 2013, Plaintiff Autumn Glen Homeowners Association, Inc. filed a Complaint against Defendant Travelers Insurance Company in Marion Superior Court, which was removed to this Court on October 4, 2013. [Dkt. No. 1.] Autumn Glen asserted three claims against Travelers – Breach of Fiduciary Duty; Breach of Contract; and Breach of the Common-Law Duty of Good Faith and Fair Dealing. [*Id.* at Ex. A.] Travelers moves for partial summary judgment as to Autumn Glen's Counts I and III (breach of fiduciary duty and bad faith).

In its Response to Defendant's Motion for Partial Summary Judgment [Dkt. No. 36] and Brief in Opposition to Defendant's Motion for Partial Summary Judgment [Dkt. No. 37], Autumn Glen represented to the Court and Travelers that it would request leave to amend its Complaint and withdraw its claim for breach of fiduciary duty (Count I). Autumn Glen has not done so in the intervening six months. Travelers has met the legal standard and requirements for summary judgment on both Autumn Glen's claim for breach of fiduciary duty *and* bad faith. Because Autumn Glen has not withdrawn its claim for breach of fiduciary duty and has not defended the same, we grant summary judgment in Travelers's favor on *both* claims.

**Ancillary Motions**

**1.    Travelers's Motion for Leave to Supplement Record in Support of Travelers's Motion for Partial Summary Judgment [Dkt. No. 38].**

Travelers seeks to submit a May 3, 2012 "Roof Damage Analysis" created by SEA, Ltd. ("the Report") for consideration in its motion for partial summary judgment. Travelers

referenced the Report in its Statement of Material Facts Not in Dispute, but did not include the Report itself in evidence. Autumn Glen Homeowners also referred to the Report in its Opposition Brief. Autumn Glen Homeowners did not object to Travelers's request to supplement the record with the Report.

We GRANT Travelers's Motion and Order that the May 3, 2012 "Roof Damage Analysis" created by SEA, Ltd. shall be included as part of the record related to Travelers's Motion for Partial Summary Judgment.

**2.    Travelers's Motion to Strike Affidavit of Mathew Latham and Plaintiffs' Brief in Opposition to Defendant's Motion for Partial Summary Judgment [Dkt. No. 40].**

Travelers has requested that we strike the Affidavit of Mathew Latham because his Affidavit is not based on personal knowledge, contains legal conclusions and speculation, and contains inadmissible hearsay. [Dkt. No. 40.] Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that "[a]n affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Self-serving statements and hearsay evidence are insufficient to defeat summary judgment. *Evans v. Morgan*, 119 Fed. Appx. 808, 810 (7th Cir. 2005). Travelers's motion is well-taken.

First and foremost, Mr. Latham's Affidavit does not explain who he is, his background or expertise, or the basis for any of the statements provided in his affidavit. Although Autumn Glen describes Mr. Latham as "Plaintiff's public adjuster," that

information is neither explained nor contained within Mr. Latham's Affidavit. Nor is the foundation of Mr. Latham's knowledge established.

Second, Mr. Latham purports to attest to discussions for which he was not present, procedures for which he has not established a foundation, and legal conclusions that he is not qualified to make. For example, the first paragraph of Mr. Latham's Affidavit purports to recount conversations related to hail damage to the roof coverings and soft metals around the complex and agreements related to the heaviest of the damage. [Latham Aff. at ¶ 1.] Mr. Latham states: "*[a]s I understand*, the adjuster stated . . . ." [*Id.* (emphasis added)] Mr. Latham's testimony as to conversations or inspections for which he was not present are inadmissible, and even so, he does not identify "the adjuster" allegedly making such statements.

Similarly, paragraph 3 of the Latham Affidavit purports to offer opinions from a time prior to Mr. Latham's engagement by Autumn Glen. By Mr. Latham's own admissions, he was not hired "to represent" Autumn Glen until *after* a settlement offer was made. [*Id.* at ¶ 4.] Mr. Latham does not explain how or in what capacity he was "hired" by Autumn Glen or how he has personal knowledge of events prior to his involvement in the matter other than through inadmissible hearsay.

Mr. Latham generalizes adjuster authority limits and "theories" but does not establish that he has a foundation for these facts or that these facts are applicable to Travelers. For example, paragraph 2 of the Latham Affidavit does not specifically relate to Travelers. That paragraph states:

> 2.     The adjuster has a spending limit, and cannot prepare estimates over a certain amount.  I am unaware of the amount, but I have been told that it is $250k.  In theory, when this adjuster prepares an estimate that exceeds that certain amount, the claim is automatically sent to the "Large Loss" adjuster, who then settles the claim.  A $250k estimate would also include a large amount of photos to support that number, along with some sort of narrative report prepared by the adjuster that would summarize and support the entire package.

[*Id.* at ¶ 2.]   The Affidavit contains no personal information about Mr. Latham's qualifications, education, or experiences related to adjuster spending limits.  Mr. Latham is not qualified as an expert witness to offer testimony pursuant to Fed. R. Evid. 702 and, in any event, his testimony says nothing about Travelers's practices and policies.

The Latham Affidavit also contains inadmissible hearsay.  For example, paragraph 5 of Mr. Latham's Affidavit states "[a]ccording to the shingle manufacturer, it was determined that the lighter damages on the northern portion of the community were significant enough to require replacement."  [Latham Aff. at ¶ 5.]  Because Autumn Glen seeks to use this statement to prove the truth of the matter asserted and the statements of the undisclosed "shingle manufacturer" do not fall within a hearsay exception, it is inadmissible.

Finally, Mr. Latham offers legal conclusions in his affidavit which are inadmissible. Mr. Latham states that adjusters have "the power to bind the insurer," the "insurer or claimant has a right to assume the adjuster has the power to ascertain the amount of the loss and settle it," and that "[t]he decision to pay for the hail damaged roof is clearly in breach of the insuring contract."  [*Id.* at ¶ 6.]   These statements are inadmissible legal conclusions.  *See Martin v. Fort Wayne Police Dept.*, No. 1:11 CV 347, 2014 WL 1047801, at *9 (N.D. Ind. Mar. 18, 2014) ("Defendants are correct that the court may not consider

legal conclusions in affidavits.") (citing *Liberles v. Cook County*, 709 F.2d 1122, 1129 (7th Cir. 1983)).

Autumn Glen does little to rehabilitate Mr. Latham's Affidavit other than to offer conclusory statements of its own. Autumn Glen argues that "[b]ased not only upon his age and state of mind, but also his role and background expertise within the roofing industry, Mr. Latham is more than capable of appreciating the circumstances set forth within his affidavit." [Dkt. No. 43 at 2.] "Although personal knowledge can include inferences and opinions of the affiant, such inferences must nonetheless be substantiated by specific facts." *Fulmore v. Home Depot, U.S.A., Inc.*, 423 F. Supp. 2d 861, 871 (S.D. Ind. 2006) (citing *Drake v. Minnesota Mining & Manuf. Co.*, 134 F.3d 878, 887 (7th Cir. 1998)). Mr. Latham's affidavit includes no facts about his age, his role, his background, or his factual basis for any of the statements contained within his Affidavit – "appreciating the circumstances" is not the equivalent of personal knowledge.

Autumn Glen argues that "it is only logical that Mr. Latham could not offer information based upon the actions or communications made by Travelers or its representatives, if he had not heard, observed or otherwise possessed [] first-hand knowledge of the same." [Dkt. No. 43 at 3.] We agree, which is why the Latham Affidavit is inadmissible. The Latham Affidavit does not establish Mr. Latham's hearing, observing, or possessing first-hand knowledge of actions or communications by Travelers and Autumn Glen has provided no evidence of the same. As a result, we GRANT Travelers's Motion to Strike. [Dkt. No. 40.] The Court will discount all arguments in Autumn Glen's Brief based on the Latham Affidavit accordingly.

## Undisputed Facts

Autumn Glen does not dispute any of the facts set forth in Travelers's Statement of Material Facts Not In Dispute [Dkt. No. 28 at 2-12]. [*See* Dkt. No. 37 at 3.][1] The Southern District of Indiana Local Rule 56-1(b) requires that a response to a motion for summary judgment "must include a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." Autumn Glen did not include such a section in its brief. "The rule leaves no doubt as to the ramifications of failing to submit an appropriate factual statement in opposition to a motion for summary judgment: 'the Court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy . . . .'" *Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir. 1994). "A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed. Indeed, as we have stated on a number of occasions, '[a] local rule of a federal district court is written by and for district judges to deal with the special problems of their court, and we are disposed therefore to give a district judge's interpretation of his court's

---

[1] Autumn Glen arguably attempts to create a genuine issue of material fact by alleging via the Latham Affidavit that "the adjuster stated that he would replace the roofs on the southern portion of the community along with the soft metals around the entire community" [Dkt. No. 36-1 at ¶ 1], whereas, Travelers submits that its adjuster, Taylor, did not make any promises or commitments about damages or losses [Taylor Aff. at ¶ 19]. Autumn Glen's statement is unsupported hearsay and cannot be used to defeat summary judgment by creating a genuine issue of material fact. Fed. R. Civ. P. 56(c)(4); *Evans*, 119 Fed. Appx. at 810.

local rules . . . considerable weight.'" *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 810-11 (7th Cir. 2005) (quoting *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1316 (7th Cir.1995)).  Even so, Autumn Glen relies solely upon the Affidavit of Mathew Latham, which we have now stricken.  Consequently, because Autumn Glen did not follow the local rules and its sole affidavit has been stricken, we consider the facts presented in Travelers's Motion for Partial Summary Judgment to be admitted and undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2).

From March 29, 2012 to March 29, 2013 Travelers had a commercial insurance policy in effect insuring the Autumn Glen Condominiums (the "Complex") (Condominium Pac (the "Policy")).  [Dkt. No. 28-1.]  The relevant insuring provision in the Policy provides that:

> **A. Coverage**
>
> We will pay for direct physical loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.

[*Id.*]  The Policy also contains the following condition:

> *****
>
> 3. Duties in the Event of Loss or Damage
>
> a. You must see that the following are done in the event of loss or damage to Covered Property:
>
> *****
>
> (6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records, permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

8

\*\*\*\*\*

(9) Cooperate with us in the investigation and settlement of the claim.

[*Id.* at 35-36]  An additional section of the Policy, titled "Loss Payment – Building and

Personal Property," provides in part:

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to Paragraph b. below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to Paragraph b. below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of Paragraph e. below or any applicable provision which amends or supersedes these evaluation conditions.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property, except as provided in the Ordinance or Law Additional Coverage.

c. We will give notice of our intentions within 30 days after we receive the proof of loss.

d. We will not pay more than your financial interest in the Covered Property.

e. We will determine the value of Covered Property in the event of covered loss or damage as follows:

(1) At replacement cost (without deduction for depreciation), except as provided in Paragraph (2) through (18) below.

(a) You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a

replacement cost basis. In the event that you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement basis if you notify us of your intent to do so within 180 days after the loss or damage.

(b) We will not pay on a replacement basis for any loss or damage:

(i) Until the lost or damaged property is actually repaired or replaced; and

(ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

[*Id.*]

Autumn Glen alleges that the Complex suffered hail damage as the result of a thunderstorm on April 1, 2012. [Dkt. No. 1-1 at ¶ 2.] On April 10, 2012, Gregory & Appel (Autumn Glen's insurance broker) faxed a "Property Loss Notice" (the "Notice") to Travelers, which contained the designated loss date of April 1, 2012, a description of the loss, and the contact information for Autumn Glen's designated representative, Chris Noll ("Noll"). [Dkt. No. 28-3.] The Notice also indicated that Travelers should contact roofer, Randy Adkins ("Adkins") to arrange an inspection. [*Id.*] Upon receiving the Notice, Travelers assigned the Claim to Traveler's claim representative, Christopher A. Taylor ("Taylor"). [Dkt. No. 28-4 at ¶ 9 ("Taylor Aff.").] That same day, Taylor called Noll to obtain information about the damage to the Complex. [*Id*. at ¶ 11.]

Travelers's claims representatives and adjusters follow established procedures and criteria when investigating hail damage claims to determine whether the damage requires total roof replacement or a repair. [Dkt. No. 28-5 at ¶ 7 ("Brunsdon Aff."); Taylor Aff. at ¶ 14.] Travelers's established procedures and criteria include in part the evaluation of

identifiable "hits" of hail damage; and the quantity of hits within a 10' x 10' test square on the roof to determine whether the roof should be repaired or replaced. [Brunsdon Aff. at ¶ 9.] To justify declaring the roof or a slope of the roof a total loss, the adjuster must find a minimum number of ten (10) to twelve (12) hail hits within the test square; anything less results in a decision to pay to repair the damaged shingles and other roofing components. [*Id*. at ¶ 10.] Travelers's protocols are consistent with industry standards. [Brunsdon Aff. at ¶ 11; Taylor Aff. at ¶ 8.]

On April 11, 2012, Taylor spent approximately one (1) hour inspecting the Complex with Adkins, but he did not find hail damage to shingles at the rear and middle of the Complex. [Taylor Aff. at ¶¶ 12, 15-16.] Toward the front of the complex, Taylor and Adkins found "aged" shingles, places that resembled hail hits, and damage to roofing metals and gutters. [*Id*. at ¶ 16.] Based on his inspection, Taylor believed that the Claim would be assigned to Travelers's "Major Case Unit" for further handling because based on his inspection, approving payment on the purported damage to the Complex exceeded his authority. [*Id*. at ¶¶ 17-18.] Taylor also did not make any promises or commitments about damages or losses to Adkins because the purported damage exceeded his authority. [*Id*. at ¶¶ 18-19.]

On April 13, 2012, Travelers assigned the Claim to William Brunsdon, General Adjuster for Travelers with the Commercial Property Major Case Unit. [Brunsdon Aff. at ¶ 12.] Upon receiving the file, Brunsdon hired SEA, Ltd. ("SEA") and Hayes & Sons Complete Restoration ("H & S") to assist with his inspection. [*Id*. at ¶ 13.] On April 13, 2012, Brunsdon called Noll and arranged an additional inspection, to take place on April

17, 2012. [*Id*. at ¶¶ 14-15.] During that conversation, Noll informed Brunsdon that Autumn Glen would have Adkins on site for that inspection. [*Id*. at ¶ 15.] Brunsdon and the representatives from SEA and H&S went to the Complex on April 17, 2012 and spent approximately four (4) hours there, but Adkins failed to join them. [*Id*. at ¶¶ 17-18.]

While at the inspection on April 17, 2012, Brunsdon and the representatives from SEA and H&S did not see evidence of hail damage on the roofs; accordingly, Brunsdon called Adkins and asked where he had found hail damage. [*Id*. at ¶¶ 19-20.] Adkins told Brunsdon that he and Taylor reviewed a few buildings on the north side of the Complex and did not find much hail damage. [*Id*. at ¶ 21.] Adkins also told Brunsdon that if Brunsdon and the others moved to the middle and front side of the Complex they would find more hail damage. [*Id*. at ¶ 22.] Brunsdon did not find any hail damage to the Complex's roofs, gutter systems, units, facia boards, siding, windows and trim on the buildings that warranted replacement; however, Brunsdon did find hail damage to the soft metals that warranted replacement. [*Id*. at ¶ 23.]

After the inspection, Brunsdon called Noll and told him of the findings from the inspection. [*Id*. at ¶ 25.] After considering the inspection and investigation and the input from the representatives from SEA and H&S, Brunsdon determined that Autumn Glen was due the actual cash value for hail damage to the soft metals on the buildings. [*Id*. at ¶ 26.] Next, Brunsdon asked the SEA representative to prepare a report with his observations, findings and opinions regarding the damages found at Autumn Glen, and asked the H&S representative to prepare an estimate for the damages found to the soft metals at the site. [*Id*. at ¶ 27.]

On April 13, 2012, Brunsdon received the H&S estimate, after which he revised the estimate to account for depreciation of $25,321.64 to arrive at an "Actual Cash Value" of $72,951.97. [*Id*. at ¶¶ 28-29.] After applying Autumn Glen's $5,000 deductible, Brunsdon determined that Autumn Glen's hail damage claim had a net value of $67,951.97 for the hail damage to the soft metals at the Complex. [*Id*. at ¶ 30.]

On April 18, 2012, Brunsdon spoke with Ross Koch, Travelers's Executive General Adjuster about the Autumn Glen Claim and about Travelers's plan of action. [*Id*. at ¶ 31.] On April 24, 2012, Brunsdon called Noll about the estimate and then e-mailed Noll the estimate and informed Noll that he would forward the SEA report upon receipt. [*Id.* at ¶ 32.] On April 25, 2012 – fourteen days after receiving Autumn Glen's Property Loss Notice – Travelers sent a check to Autumn Glen in the amount of $67,951.97. [*Id*. at ¶ 33.]

On May 21, 2012, Brunsdon received SEA's Roof Damages Analysis Report, which confirmed that: (1) while hail had struck the furnace stack caps, attic vents and roof flashings resulting in small indentations, those indentations did not affect the function or useful service life of those roofing components, and (2) that the hail did not indent or damage the shingle roofing on the structures. [*Id*. at ¶ 34.] Brunsdon forwarded a copy of the SEA Report to Noll on May 21, 2012. [*Id*. at ¶ 35.] On July 19, 2012, Brunsdon asked Noll whether the repair work had been completed as well as whether Autumn Glen was making a claim on the $25,321.64 holdback for depreciation. [*Id*. at ¶ 36.] On July 27, 2012, Noll e-mailed Brunsdon and informed Brunsdon that Autumn Glen had hired a certified public adjuster, Matt Latham ("Latham"), and that Latham would be representing Autumn Glen. [*Id*. at ¶ 37.]

On August 15, 2012, Brunsdon called Noll and left a voice-mail message for Noll requesting a status update. [*Id*. at ¶ 38.] On September 13, 2012, Brunsdon sent a follow up e-mail to Noll informing him that Latham still had not made contact with Brunsdon, and Noll replied that he would follow up with Latham. [*Id*. at ¶ 39.] On September 18, 2012, Brunsdon received an e-mail from Latham stating that he was waiting on Autumn Glen's engineer's report. [*Id*. at ¶ 40.] Brunsdon replied via e-mail the same day asking Latham to send the engineer's report upon receipt. [*Id*. at ¶ 41.] On November 1, 2012, after not having heard from Latham since they exchanged e-mails on September 18th, Brunsdon sent a follow up e-mail to Latham and Noll, asking Latham again to please forward any and all reports from any parties who evaluated the roofs for either Latham or Autumn Glen, and asking Latham to contact him immediately as to the status so that Brunsdon could update his file. [*Id*. at ¶ 42.]

On November 2, 2012, Latham e-mailed Brunsdon and stated that he would be completing his report soon and that he would send everything he had when the file was complete. [*Id*. at ¶ 43.] On December 5, 2012, Brunsdon called and e-mailed Latham and Noll to ask when he would receive the reports. [*Id*. at ¶ 44.] On December 7, 2012, Brunsdon received an e-mail from Latham informing Brunsdon that Latham had just received all the information he needed to complete his file that week, that he would be putting the information together and that would provide something to Brunsdon the following week. [*Id*. at ¶ 45.]

On December 20, 2012, Brunsdon received a package from Latham, which included, among other things, a cover letter from Latham with Latham's opinions about

Travelers's claims handling process on the Autumn Glen Claim, an unsigned "Sworn Statement in Proof of Loss" claiming damages to Autumn Glen of $2,097,531.75, a letter from Genesis Weather Solutions, LLC in which Genesis reported about a hail storm on May 1, 2012 (not April 1, 2012), a copy of CSE Engineering & Consulting, LLC's report, an article authored by Haag Engineering, Inc. ("Haag Engineering") regarding "Hailstorm Characteristics," a 158-page estimate of the damages at Autumn Glen dated November 26, 2012, and other miscellaneous materials (the "Crossroads Claim Package"). [*Id.* at ¶ 46; Dkt. No. 28-6 ("Crossroads Claim Package").] In part, the Crossroads Claim Package relied on comments Adkins claims Taylor made about damage to the roofs during their initial inspection of the site on April 11, 2012. [Brunsdon Aff. at ¶ 47; Crossroads Claim Package at p. 4.]

On January 15, 2013, Brunsdon sent a letter to Latham, addressing the perceived inconsistencies or inaccuracies in Latham's evaluation and assessment of Travelers's handling of the Autumn Glen claim, and raising specific concerns with Latham's engineer's report and Latham's estimate of the nature and extent of the damages. [Brunsdon Aff. at ¶ 55; Dkt. No. 28-7 ("January 15, 2013 Letter").] Brunsdon further explained in the letter that Latham's expert appeared to have relied on an incorrect standard of hits per 10'x10' area to recommend replacing roofs. [Brunsdon Aff. at ¶ 56; January 15, 2013 Letter at p. 3.] Brunsdon's letter also proposed having Haag Engineering inspect the roofs at the Complex at Traveler's cost if parties would accept the report Haag would issue. [Brunsdon Aff. at ¶ 57; January 15, 2013 Letter at p. 3.]

On February 13, 2013, Brunsdon received a letter from Latham expressing additional opinions about Travelers's handling of Autumn Glen's Claim and rejecting Travelers's offer to retain Haag Engineering. [Brunsdon Aff. at ¶ 58; Dkt. No. 28-8 ("February 13, 2013 Letter").] Mr. Latham offered to meet Mr. Brunsdon on site. [February 13, 2013 Letter.] On March 5, 2013, Brunsdon responded to Latham's February 13th letter, proposing that Latham and his engineers, and Travelers and its engineers, meet at Autumn Glen for a face-to-face inspection and review of the roofs together. [Brunsdon Aff. at ¶ 59; Dkt. No. 28-9 ("March 5, 2013 Letter").]

On March 15, 2013, Latham responded to Brunsdon by rejecting Brunsdon's invitation to meet at Autumn Glen to inspect the roofs. [Brunsdon Aff. at ¶ 60; Dkt. No. 28-10 ("March 15, 2013 Letter").] On March 28, 2013, Brunsdon responded to Latham's March 15th letter by again describing Travelers's basis for its decision and reminding Latham that Travelers had remained open to meeting, had invited him to send any information that had not been provided to Travelers, and had explained to Autumn Glen that the Complex could assert a claim for the withheld depreciation according to the terms and conditions of the Policy. [Brunsdon Aff. at ¶ 61; Dkt. No. 28-11 ("March 28, 2013 Letter").] Brunsdon's March 28th letter concluded by restating Travelers's reasons for rejecting the proof of loss Autumn Glen submitted, including the fact that Travelers did not agree that the buildings sustained hail damage to their roof shingles, that Latham's reports provided no new information to change Travelers's conclusion, and that Latham's damages estimate of $2,097,531.75 was inflated because of his broad view of the scope of damage to the Complex. [Brunsdon Aff. at ¶ 62; March 28, 2013 Letter at p. 3.]

On April 23, 2013, Brunsdon received a fax from The Voss Law Firm with a demand for payment to settle the Autumn Glen Claim for $5,123,363.40, plus attorney fees of $500,000.00. [Brunsdon Aff. at ¶ 63; Dkt. No. 28-12 ("April 23, 2013 Letter").] On May 1, 2013, Attorney John C. Trimble, hired by Travelers, sent a letter to Lucas Mauro with The Voss Law Firm to request information regarding the firm's admission to practice law in Indiana, or, in the alternative, confirm that the firm has associated with an Indiana firm so that they could engage in substantive discussions. [Dkt. No. 28-13 ("May 1, 2013 Letter").] When the Voss Law Firm did not respond, Trimble sent a second letter to Mauro with the Voss Law firm on May 20, 2013 requesting a response to his May 2, 2013 letter. [Dkt. No. 28-14 ("May 20, 2013 Letter").] When the Voss Law Firm did not respond to the second letter, Trimble sent a third letter on August 20, 2013 enclosing copies of his previous two letters and reaffirming Travelers's willingness to discuss Mauro's April 19th demand letter. [Dkt. No. 28-15 ("August 20, 2013 Letter").]

On or about September 20, 2013, Travelers was served with Autumn Glen's Complaint. [Dkt. No. 1-2.] The Complaint asserting a claim for Breach of Contract, Breach of Fiduciary Duty, and for Breach of the Common-Law Duty of Good Faith and Fair Dealing. [*Id.*]

### Summary Judgment Standard

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that

a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the Court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *Id.*, at 247, nor the existence of "some metaphysical doubt as to the material facts," (*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)) will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325; *Doe v. R.R. Donnelley & Sons, Co.,* 42 F.3d 439, 443 (7th Cir. 1994). Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *Celotex,* 477 U.S. at 322*; Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

**Legal Analysis**

This case is before us based on diversity jurisdiction. "It is a long-recognized principle that federal courts sitting in diversity 'apply state substantive law and federal procedural law.'" *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) (citing *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)). Consequently, Indiana law applies to the claims in this case. The parties agree to the legal standard for a claim of bad faith against an insurer and cite many of the same cases in their arguments.

Indiana law recognizes a legal duty, implied in all insurance contracts, requiring the insurer to deal in good faith with its insured. *Erie Ins. Co. v. Hickman by Smith,* 622 N.E.2d 515, 520 (Ind. 1993); *see Jackson v. Allstate Ins. Co.*, 780 F. Supp.2d 781 (S.D. Ind. 2011). The evidentiary standard is high for establishing bad faith under Indiana law on the part of an insurer: "[A] good faith dispute about the amount of a valid claim or about whether the insured has a valid claim at all will not supply the grounds for a recovery in tort for the breach of the obligation to exercise good faith. This is so even if it is ultimately determined that the insurer breached its contract." *Erie,* 622 N.E.2d at 520 (emphasis added); *accord, McLaughlin v. State Farm Mut. Auto. Ins. Co.*, 30 F.3d 861, 867-68 (7th Cir. 1994) (applying *Erie v. Hickman* and reversing award of punitive damages for bad faith denial of coverage). Moreover, the lack of a diligent investigation by the insurer is not, without more, a breach of the duty of good faith dealing. *Erie*, 622 N.E.2d at 520. An insurance company has a duty in the ordinary course of business to investigate and evaluate claims made by its insureds. *Burr v. United Farm Bureau Mut. Ins. Co.,* 560 N.E.2d 1250, 1255

(Ind. Ct. App. 1990); *Thompson ex rel. Thompson v. Owensby,* 704 N.E.2d 134 (Ind. Ct. App. 1998).

To prove bad faith, a plaintiff must establish, by clear and convincing evidence, that the insurer had knowledge at the time of its determination that there was no legitimate basis for the position it was taking. *Masonic Temple Ass'n of Crawfordsville v. Indiana Farmers Mut. Ins. Co.,* 779 N.E.2d 21, 29 (Ind. Ct. App. 2002). Indiana case law is replete with reminders of the kind of conduct by the insurer that does and does not constitute bad faith: "[P]oor judgment and negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present." *Hoosier Ins. Co. v. Audiology Found. of Am.,* 745 N.E.2d 300, 310 (Ind. Ct. App. 2001); *Heritage Mut. Ins. Co. v. Advanced Polymer Tech., Inc.,* 97 F.Supp.2d 913, 936 (S.D. Ind. 2000) (quoting *Colley,* 691 N.E.2d at 1261). "A finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Colley v. Indiana Farmers Mut. Ins. Group,* 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998). A bad faith determination inherently includes and requires an element of culpability.

The obligation of good faith and fair dealing includes the obligation to refrain from: (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in payment; (3) deceiving the insured; and (4) exercising an unfair advantage to pressure an insured into settlement of his claim. *Erie,* 622 N.E.2d at 519; *see also Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002) (finding that an insurance company did not act in bad faith in refusing to defend its insured based on its interpretation of contract provision, even though that denial might have been erroneous); *Thompson Hardwoods,*

*Inc. v. Transp. Ins. Co.,* No. NA 0074CHK, 2002 WL 440222 (S.D. Ind. Mar. 15, 2002) (summary judgment in favor of insurer on bad faith claim; applying *Erie v. Hickman* and determining that the predominant issue in bad faith setting is whether insurer had "rational, principled basis" for its actions at the time of the claimed improper acts, not whether those actions were correct in hindsight); *Masonic Temple,* 779 N.E.2d at 29 (under Indiana law an insurer avoids liability for acting in bad faith when its claims handling decisions were made in good faith and upon a rational basis).

Travelers has set forth a thorough overview of the detailed method it employed to adjust Autumn Glen's claim. [*See generally* Brunsdon Aff.] The evidence establishes that Travelers expeditiously inspected the alleged damage and then referred the matter to another adjuster who performed a second lengthy inspection with an engineer and hail damage expert, and invited Autumn Glen's representative to attend that inspection but he did not. Ultimately, Travelers relied on inspections and expert opinions to value Autumn Glen's claim and sent it a $67,951.97 check a mere fifteen (15) days after receiving the notice of claim.

Arguably, these actions by Travelers would themselves eviscerate any claim of bad faith. But Travelers went even further by forwarding its damage report to Autumn Glen and inquiring about repairs and whether Autumn Glen was making a claim for the depreciation holdback. Travelers followed up with Autumn Glen between July 27, 2012 and November 1, 2012 to inquire about Autumn Glen's engineer's investigation. After receiving the Latham Report and estimate (which was much higher than Travelers's), Travelers explained its position and Travelers offered a third party inspection, which

Autumn Glen rejected. After receiving a settlement demand, Travelers's lawyers sent three communications to Autumn Glen's lawyers, all of which went unanswered. None of these facts are disputed.

Autumn Glen attempts to create a genuine issue of material fact and show bad faith by pointing to the "first inspection" and the "first adjuster's" agreement with regard to repairs. [Dkt. No. 37 at 4.] Assuming for a moment that Autumn Glen's argument was supported by admissible evidence and Autumn Glen followed the Local Rules, these facts support nothing more than Autumn Glen's argument that Travelers undervalued its claim. At best, Autumn Glen has called into question whether two different adjusters at Travelers came to two different conclusions related to Autumn Glen's claim. These facts, even assuming they were properly before the Court, do not show that Travelers acted with a dishonest purpose, moral obliquity, furtive design, or ill will. These facts do not show that Travelers had knowledge that its position on Autumn Glen's claim had no legitimate basis. "[A] good faith dispute about the amount of a valid claim or about whether the insured has a valid claim at all will not supply the grounds for a recovery in tort for the breach of the obligation to exercise good faith. This is so even if it is ultimately determined that the insurer breached its contract." *Erie*, 622 N.E.2d at 520 (emphasis added). No evidence before the court shows that "Mr. Brunsen [sic], suppressed the original report, estimate, and binding agreement that was made and prepared by an authorized agent of Travelers" such that Travelers acted in bad faith.

The *Celotex* standard for motions for summary judgment sets forth that the moving party "may discharge its burden by showing an absence of evidence to support the non-

moving party's case." *Celotex,* 477 U.S. at 325; *R.R. Donnelley & Sons, Co.,* 42 F.3d at 443. Not only has Travelers established that it did not act in bad faith, but Autumn Glen has presented no evidence to support such a claim. The facts are undisputed and no evidence presented demonstrates that Travelers (1) made an unfounded refusal to pay policy proceeds; (2) caused an unfounded delay in payment; (3) deceived Autumn Glen; or (4) exercised an unfair advantage to pressure Autumn Glen to settle its claim, or even creates a genuine issue of fact as to the evidence. Because no genuine dispute of material fact exists and Travelers is entitled to judgment as a matter of law, we GRANT Travelers's Motion for Partial Summary Judgment.

### Conclusion

For the foregoing reasons, we:

1.    GRANT Travelers's Motion for Leave to Supplement Record in Support of Travelers's Motion for Partial Summary Judgment and Order that the May 3, 2012 "Roof Damage Analysis" created by SEA, Ltd. shall be included as part of the record related to Travelers's Motion for Partial Summary Judgment [Dkt. No. 38];

2.    GRANT Travelers's Motion to Strike Affidavit of Mathew Latham and Plaintiff's Brief in Opposition to Defendant's Motion for Partial Summary Judgment [Dkt. No. 40]; and

3.    GRANT Travelers's Motion for Partial Summary Judgment [Dkt. No. 27] as to Counts I and II of Autumn Glen's Complaint.

Date: 3/18/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

3/Distribution:

Michael Shane Thompson
26619 Interstate 45
The Woodlands, TX 77380

Eric C. McNamar
LEWIS WAGNER LLP
emcnamar@lewiswagner.com

John Carl Trimble
LEWIS WAGNER LLP
jtrimble@lewiswagner.com

Lewis S. Wooton
LEWIS WAGNER LLP
lwooton@lewiswagner.com

Brad A. Catlin
PRICE WAICUKAUSKI & RILEY
bcatlin@price-law.com

William N. Riley
PRICE WAICUKAUSKI & RILEY
wriley@price-law.com

Scott G. Hunziker
THE VOSS LAW FIRM
scott@vosslawfirm.com